RENDERED: APRIL 29, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0613-WC

TRANE CO.                                                                    APPELLANT

v.
PETITION FOR REVIEW OF A DECISION
OF THE WORKERS' COMPENSATION BOARD
ACTION NO. WC-20-00127

TIM PARSON; HONORABLE GRANT
S. ROARK, ADMINISTRATIVE LAW
JUDGE; AND WORKERS'
COMPENSATION BOARD                                             APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, GOODWINE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE: Trane Co. has petitioned this Court for review of the April

30, 2021, opinion of the Workers' Compensation Board (the Board) affirming the

Administrative Law Judge's (ALJ) December 14, 2020, opinion, order, and award.

Trane challenges the findings that the entirety of Tim Parson's shoulder

impairment was related to his work and that he was entitled to the 3x multiplier pursuant to Kentucky Revised Statutes (KRS) 342.730(1)(c)1. We affirm.

Parson, who was born in 1973, worked for Trane as a line worker from March 27, 1995, through October 25, 2019. During his employment, Parson claimed to have been subjected to cumulative trauma to his neck, back, and shoulder that resulted in an injury.[1] He filed an application for resolution of his injury claim on January 24, 2020. In support of his claim, Parson attached the report of chiropractor Dr. Julie Ann Martin detailing the results of her December 30, 2019, examination, in which she diagnosed him with spinal nerve root compression, shoulder pain, and cervical, thoracic, and lumbar segmental dysfunction. Dr. Martin included her impressions of the cervical, thoracic, and lumbar x-rays taken that day. Trane filed a notice that it was denying Parson's claim for several reasons, including the existence of a dispute regarding the amount of compensation it owed, that Parson was not employed by Trane on the date of injury, that the alleged injury did not arise out of the course of his employment, that Parson did not provide due and timely notice, and that the claim was barred by the statute of limitations. Trane also alleged that Parson had unreasonably failed to follow medical advice pursuant to KRS 342.035(3).

---

[1] Because only Parson's shoulder condition is at issue, we shall generally limit our discussion to his shoulders.

Trane filed records from the Kentucky Department of Fish and Wildlife Resources that established Parson had obtained various hunting licenses every year from 1997 through 2019, with the exceptions of 2002, 2003, and 2009. Trane also filed records from Kentucky's Office of Unemployment Insurance, which established that Parson had collected unemployment benefits from November 16, 2019, through February 22, 2020. The reason for separation was listed as lack of work. Trane was moving its operations to Columbia, South Carolina.

Parson filed the medical report of Dr. Bruce Guberman detailing the results of his March 19, 2020, examination. Parson's chief complaint was cumulative trauma injuries to his neck and shoulders. Parson reported a history of bilateral shoulder pain that began two years previously without a specific injury. He had not seen a physician, had any imaging studies, or any treatment for his shoulders. He stated that he had intermittent pain in both shoulders. And he said his symptoms were more severe when he used his left arm, especially overhead. Parson reported that he began working for Central Kentucky Hauling as a garbage truck driver on March 4, 2020. He spent most of his time driving and did not have to lift garbage or put it in the truck.

Parson described his work at Trane to Dr. Guberman as follows:

He states the last day he worked he was operating controls. That involved standing and burning wire. He

states that approximately 75 percent of the time he had to use his arms above the level of his shoulders and he had to do repeated lifting and movement with the wiring. He states that before then he was a line leader for five years. That involved standing on concrete and having to check inventory, but he did not have to do excessive lifting. Before then, he worked on a machine that punched metal forms. He had to put metal into the machine and remove it. He states that the pieces of metal varied in size, but he estimates it weighed between 8 and 40 pounds. He did that repeatedly and also had to use his arms overhead to put objects on a higher shelf. He did that work for approximately one year.

Before then, he worked foaming panels. That involved unloading racks and rotating with racks continuously. He also had to lift objects off the racks and flip panels. He did that for approximately one year. He also states that for an approximately six-month period of time about three years ago he worked on a line lifting panels overhead. He states these weighed on the average of 35 pounds up to 50 pounds. They had to be lifted overhead and over shoulder level.

Parson reported that he stopped working on October 25, 2019, as Trane was relocating. He took a severance package. He went on to state that he was experiencing difficulty maintaining his employment before he took his severance package. He did not believe he could presently perform that type of work because his neck and shoulder pain had worsened and required the "frequent use of his arms, at times overhead and above his shoulder level." He reported having difficulties driving at times as well as with hunting, fishing, and doing yardwork.

Dr. Guberman included the various measurements he took of Parson's shoulders during the examination.  Based on his examination, Dr. Guberman diagnosed Parson with chronic strain and degenerative disease of the cervical spine and chronic strain of both shoulders, which were both attributed to cumulative work trauma.  The examination revealed tenderness and abnormalities in the range of motion for both shoulders.  He believed Parson's work caused the impairment and that it was not due to a cause other than work.  As for an impairment rating, Dr. Guberman assigned a 3% whole body impairment to Parson's right shoulder cumulative trauma injury and a 4% whole body impairment to the left shoulder.  These impairments were calculated pursuant to the American Medical Association's Guides to the Evaluation of Permanent Impairment, Fifth Edition, (the AMA Guides).  Dr. Guberman did not believe Parson retained the physical capacity to return to the type of work he performed at the time of his injury, stating, "In my opinion, he is unable to use his arms repeatedly for overhead work, and furthermore, in my opinion, he is unable to lift, carry, push or pull objects weighing more than 25 to 30 pounds occasionally or more than 5 to 10 pounds frequently."  Dr. Guberman would also place these restrictions on Parson's work activities.

Parson was deposed on March 31, 2020.  At that time, he was 46 years old.  He lived with his wife in Harrodsburg and owned rental property in

Garrard County. He was responsible for half of the upkeep for the rental property, and he took care of fixing minor issues. Parson said he hunted and fished, but had only fished three times and hunted maybe one time the previous year. He obtained his GED in 2002 and also obtained his commercial driver's license (CDL). Parson reported a previous injury to his back in 1998 when he was working for Trane. He filed a claim but did not receive any money.

Parson went on to describe his various positions at Trane and what duties he had in those positions. He worked on the coil line from 1995 to 1999. That position involved pushing and pulling as well as using hand guns. He may have had to do some overhead work while he was welding. He then moved to fabrication, where he worked for a year until 2000. He explained, "[w]e rotated, we insulated, sometimes run a punch, sometimes run a brake. Of course the brake, you had to lift – lift the metal up. Most of the time there's two of you, one on each side." The most demanding part of that job was lifting the brakes. Parson's next position was 527, which entailed running lasers and brakes. He would have to yank different sized sheets of metal and throw them up on the lasers. The sheets of metal weighed about 50 pounds. He spent a year in this position. Parson then moved to controls, where he worked for five years. In that position, "[y]ou run motor wires – or you had to connect the motor wires and run – route them. And then you had to test everything, and if there's a problem, you had to troubleshoot,

find out where your shorts were at." He said this job was hard on his hands but that there was no heavy lifting. Parson then went to the docks for five years, where he performed several tasks, including driving a tractor-trailer, being on a tow loading trailers, and running a crane.

Parson's next position was in the foam cell area. On one side of this area, he had to off-load panels full of foam onto a rack and flip them. On the other side of this area, he would put patches or tape over the holes to keep the foam from coming through. Parson said it was difficult to flip the panels as they weighed about 75 pounds. He said this hurt his shoulders and back. He moved off this area after about seven months. He worked on the patching side for about five months. Parson then moved to the saws area for about one year, where "[y]ou had a machine that's cutting and forming the metal and you had to pull the metal off, put it on a rack." These pieces of metal weighed about 35 pounds. His shoulders bothered him while he worked in this position, and he wanted to go to another position where it would be easier on him. At that point, he became a team or lean leader, and he was in this position for the next five years. Parson described this as one of the easier jobs. He did a lot of walking, and he looked for parts, kept inventory, and took care of a couple of boards. After that position was eliminated, he went back to controls, which was the last position he held at Trane. He did this

for close to one year. He said his shoulder and back "felt rough quite often" when he last worked at the controls position.

Parson last worked for Trane on October 25, 2019. He said he was feeling "rough" and was worried about keeping his job. He wanted to "get out of there while [he] could." He received a severance package of about $20,000.00. Trane was laying people off because the factory was moving, and he took the opportunity to get the money. When he left, he was having problems with his shoulder. At that time, he was earning $22.50 per hour working 40-plus hours per week. He was not under any work restrictions or being treated for any problems. When asked if he could return to Trane to perform the jobs he had been doing, Parson stated, "[t]hat was one reason I left, because I was feeling rough every day. I needed something different. If I was the lean leader again, I could probably do it." He said a lot of the other work hurt him.

Parson testified that both shoulders bothered him, with the left one bothering him the majority of the time. He had never sustained an acute injury to either shoulder, had never had any treatment for his shoulders, and was not taking any medication for them. He said his shoulders began to bother him while he was working on the saws or in the foam cell areas. His work caused wear and tear. He said, "I wasn't for sure anything was wrong until I left Trane, but I was wanting to be checked out because I knew I was having issue[s]." He had only seen Dr.

Martin for his shoulder problems. He said his shoulder would be sore and hurt, and would make his neck hurt, but this did not impede his work for his current employer. He was able to raise his hands above his head.

Parson obtained new employment with Central Kentucky Hauling in a CDL position, earning $18.00 per hour and working 45 to 60 hours per week. He had been working there for four weeks at the time of the deposition. Parson had updated his CDL in January of 2020 and underwent a physical examination, which he passed. Parson described his current employment as driving the Mack truck around and using buttons to pick up garbage. There was no lifting involved, and he did not have to do any mechanic work. He did not have any work restrictions.

Trane introduced the October 4, 2019, medical report of Dr. James Werkmeister of Lancaster Primary Care. This did not contain any mention of shoulder problems. A record of his August 18, 2008, visit notes Parson's complaints of neck stiffness after playing in the pool with children on his shoulders.

Trane filed the July 13, 2020, independent medical evaluation by Dr. Rick Lyon of Rebound Orthopaedics & Sports Medicine P.S.C. Dr. Lyon explained Parson's work at Trane as follows:

> Mr. Parson is a 47-year-old, right-hand dominant gentleman who worked at Trane for close to 25 years. He states he rotated jobs frequently unless he found a job he particularly liked. He reports he worked on the coil

line for a total of about five years, fabrication for about a
year, laser brakes for about a year, the docks for four to
five years and controls for about five years.

As to his shoulder issues, Dr. Lyon stated:

Mr. Parson reports experiencing pain in the superior
aspect of both shoulders, left worse than right.  When his
shoulders are particularly bothersome, he states he
experiences a crick in his neck.  He states he recalls
experiencing shoulder pain while performing the "foam
seal" job approximately eight years ago or in 2012.  He
states the job required him to repetitively flip double
panels.

Dr. Lyon performed a physical examination of Parson's back, neck, and shoulders,

including range of motion measurements.  He also reviewed past imaging studies

and records.

Regarding Parson's shoulder complaints, Dr. Lyon stated:

Mr. Parson also complains of left greater than right
shoulder pain.  He states his pain began while working in
foam seal but states he does not recall experiencing a
specific work event.  It is my opinion his demonstration
of the required motion confirms some overhead work,
which is a known risk factor for the development of
shoulder pain.  However, the imaging studies reveal
typical age-related changes, and the majority of
individuals of Mr. Parson's age experience similar
symptoms.  Therefore, it is my opinion that only a
portion of Mr. Parson's current shoulder complaints may
be a result of work-related cumulative trauma (based on
his description of overhead work).

Based on his evaluation, Dr. Lyon assessed a 5% whole person impairment

pursuant to the AMA Guides, half of which may be the result of work-related

-10-

cumulative trauma. Therefore, only 3% of the impairment was a result of Parson's work. Dr. Lyon stated that Parson did not require any additional treatment for his shoulders and had reached maximum medical improvement. Parson did not have any occupational restrictions as he was able to work full-duty until he left his job at Trane.

The ALJ held a combined benefit review conference and final hearing on October 14, 2020, via ZOOM. Contested issues remained whether Parson sustained a work-related injury, whether he was entitled to permanent income benefits, his ability to return to work, and medical expenses.

At the final hearing, Parson described his various positions with Trane over his 25-year tenure. He testified that the first time he noticed any shoulder issues was at the time he went back to the foam cell area. It took two of them to flip the panels and load them onto the rack. His partner complained about his shoulders during this time. He said that his work did involve overhead work:

> A lot of times you're putting wires and stuff above your head, putting running wires, and you try not to work over your head too much. I know a lot of times when I was putting those roofs on those units you had to stretch out and sometimes you were working over your head, kind of, just a little bit over your head, pushing, trying to screw those panels in.

Parson went on to describe his current job driving a truck for Central Kentucky Hauling. He spent 90% of his time driving, which made it less physically

strenuous than his job at Trane.  As for his shoulders, Parson stated that "the top of them would be sore and aching.  You just won't want to be moving too much.  It would make you more stiff."  He described the pain as "just an ache."  His left shoulder was worse than his right one.  He described his right shoulder as "annoying sometimes."  He did not believe he could go back to the work he did for Trane.  He got his CDL because he was not going to be able to physically do any more factory work:

> Well, if I was doing what I was doing before, climbing out of and into units and working the air guns or the guns they have, my shoulders, neck and – you feel like crap going in there, and I'm thinking if they're rough enough, you ain't going to last.  They either get rid of you or you ain't going to be able to handle it and you're going to have to go.

Parson was not sure if he would be able to renew his CDL every year if he started having trouble with his shoulder and neck.  He said he had to renew his CDL every year because of his high blood pressure.

On cross-examination, Parson stated that he had not sought any medical care from a specialist for his shoulders or neck.  He did not have any restrictions for his shoulders while he worked at Trane, and he had not missed any work due to his shoulders.  He admitted that he partly left Trane because the factory was moving.  He also said it was because he was not going to last there based on how he felt.  He confirmed that he received a severance of about

-12-

$20,000.00. When he left Trane, no one had any complaints about his job performance. He received four months of unemployment benefits while looking for work as a truck driver. He wanted to stay away from factory work. He passed his physical after he left Trane to go to work at Central Kentucky Hauling, and there were no limitations or restrictions on his CDL. He said that if his shoulders were bothering him, it might cause him to have a "little bit of trouble" getting in and out of the truck. He said he could not do the last job at Trane based on the way his neck and shoulders were feeling. Parson testified that he spent 13% of his time at Trane performing overhead work.

Following the hearing, the parties filed briefs setting forth their respective positions. Trane argued that Parson was entitled to benefits solely based on a 3% whole person impairment rating for his bilateral shoulder injury based upon Dr. Lyon's evaluation. It argued that Dr. Lyon had more credibility than Dr. Guberman to assess Parson's condition, and it noted that Dr. Guberman was under the impression that Parson's job required lifting over his shoulders 75% of the time when Parson himself said he only spent 13% of his job doing overhead work. Trane also argued that Parson was not entitled to the 3x multiplier as he retained the capacity to return to the type of work he did with that company.

The ALJ entered an opinion, order, and award on December 14, 2020. The ALJ first found that Parson had not met his burden of proving he had sustained

any work-related neck or low back injuries, relying upon Dr. Lyon's evaluation.

Therefore, those claims were dismissed. As to his bilateral shoulder claim, the

ALJ concluded:

> The next issue becomes the extent of plaintiff's impairment attributable to his bilateral shoulder claim. Both the defendant's expert, Dr. Lyon, and the plaintiff's expert, Dr. Guberman, assigned impairment ratings for plaintiff's bilateral shoulders. Dr. Lyon found 5%, but indicated only 3% was due to work-related cumulative trauma. Dr. Guberman assigned 7% bilateral shoulder impairment. As between these ratings, the ALJ is ultimately most persuaded by Dr. Guberman's impairment rating. His 7% is more in keeping with the problems plaintiff indicated he had performing his job with the defendant and with Dr. Lyon's opinion that plaintiff's shoulder condition also causes plaintiff's neck pain. It is therefore determined plaintiff has a 7% impairment rating for his bilateral shoulders.

> On the issue of multipliers, Dr. Lyon concluded plaintiff requires no restrictions and could, therefore, return to the job he held at the time of the injury. Conversely, Dr. Guberman concluded plaintiff should be restricted from overhead work and lifting, pulling, or carrying more than 10 pounds frequently, and does not retain the physical ability to return to the job he held at the time of his injury. The defendant maintains Dr. Lyon's opinion on this issue is more persuasive because he is an orthopedic specialist, unlike Dr. Guberman. However, the ALJ is most persuaded by plaintiff's own credible testimony that he was having problems performing his job before he left and that he does not believe he could return to performing that job on a regular basis. Accordingly, based on plaintiff's testimony and Dr. Guberman's opinion, it is determined plaintiff does not retain the physical ability to return to the job he held at the time of his injury, thereby entitling

-14-

him to application of the 3x multiplier and KRS
342.730(1)(c)(1). . . .

Parson was also awarded medical expenses related to his shoulder injury.

Trane filed a petition for reconsideration of the ALJ's award of a 7% whole body impairment rating and the application of the 3x multiplier. It alleged that the ALJ did not consider the fact that Parson accepted a $20,000.00 severance connected to the plant's shut down when he left his employment in October 2019. He was not under any work restrictions, there were no complaints about his work performance, and he had not sought any treatment for his shoulders. In addition, Parson had returned to work with a different company as the Trane facility was shutting down. Trane also pointed to Parson's ability to maintain a relatively active lifestyle, including yard work, hunting, and maintaining his rental properties. In response, Parson asserted that Trane was merely requesting that the ALJ reweigh the evidence, which was improper. The ALJ agreed with Parson and denied Trane's petition on January 11, 2021. Trane then appealed to the Board.

In its brief to the Board, Trane continued to argue that the ALJ erred in awarding a 7% whole person impairment rating based on Dr. Guberman's opinion, as he had an inaccurate understanding of Parson's job and the amount of time he spent with his arms above shoulder level. Dr. Guberman understood Parson did so 75% of the time, while Parson testified that only 13% of his job was performed overhead. Trane also argued that the ALJ abused its discretion in

-15-

applying the 3x multiplier as he failed to address the facts that Parson had been working without restrictions or any medical treatment until he was laid off and accepted a severance package. Because his shoulder issues were not severe enough to require either medical treatment or work restrictions, Trane argued that they were not significant enough to warrant the application of the 3x multiplier. In his brief, Parson argued that the ALJ had the sole discretion to consider the evidence, and that the ALJ's findings were not so unreasonable that they needed to be reversed as a matter of law.

On April 30, 2021, the Board entered an opinion affirming the ALJ's decision. First, the Board upheld the ALJ's finding that Parson had a 7% impairment rating due to his shoulder injuries based upon Dr. Guberman's evaluation. The Board noted that Trane had not challenged Dr. Guberman's impairment rating, including through cross-examination, and that its expert, Dr. Lyon, had not offered an opinion that Dr. Guberman's calculation of Parson's impairment rating was not in accordance with the AMA Guides. Nor had Trane offered any other medical evidence to challenge Dr. Guberman's rating or calculation. Because Dr. Guberman was a licensed physician, the ALJ could rely upon his impairment rating, despite the fact that he was not an orthopedic surgeon. The Board held the ALJ had the discretion to do so. In addition, the Board rejected Trane's assertion that Dr. Guberman misunderstood how much time Parson spent

doing overhead work; he did not recite that Parson worked with his arms above his shoulders 75% of the time, but rather did so in his last position in controls. The Board held that Dr. Guberman had an accurate understanding of Parson's work in controls. And "the facts that Parson was not undergoing medical treatment, had no work restrictions, and quit after receiving a severance benefit is something the ALJ may consider but are not determinative of an issue."

Second, the Board rejected Trane's argument that the application of the 3x multiplier was not supported by substantial evidence. This award was supported by Dr. Guberman's evaluation as well as Parson's own testimony regarding his ability to perform his prior work.

> We again emphasize that Dr. Guberman had an accurate understanding of the work Parson performed at the time he ceased working for Trane. As noted, Dr. Guberman received a history from Parson of the type of work he was performing in controls. Since working in controls entailed the use of the arms above the head 75% of the time, the ALJ was free to conclude that Parson did not have the capacity to perform the work in controls which he was performing when he ceased working at Trane. Significantly, Dr. Lyon's finding Parson sustained work-related injuries to his shoulder is based on Parson's "demonstration of the required motion [that] confirms some overhead work, which is a known risk factor for the development of shoulder pain." From this the ALJ could reasonably infer the use of Parson's arms above shoulder level resulted in the work injuries.

Accordingly, the Board affirmed the ALJ's decision, and this petition for review now follows in which Trane raises the same issues.

This Court's role in reviewing workers' compensation actions is set forth in *Western Baptist Hospital v. Kelly*, 827 S.W.2d 685 (Ky. 1992). The Supreme Court directed that our function is to correct a decision of the Board only where we perceive that "the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Id.* at 687-88.

The Supreme Court later addressed this standard in *McNutt Construction/First General Services v. Scott*, 40 S.W.3d 854, 860 (Ky. 2001), explaining:

> KRS 342.285(2) provides that when reviewing the decision of an ALJ, the Board shall not reweigh the evidence and substitute its judgment for that of the ALJ with regard to a question of fact. The standard of review with regard to a judicial appeal of an administrative decision is limited to determining whether the decision was erroneous as a matter of law. *See American Beauty Homes v. Louisville & Jefferson County Planning & Zoning Commission*, Ky., 379 S.W.2d 450, 457 (1964). Where the ALJ determines that a worker has satisfied his burden of proof with regard to a question of fact, the issue on appeal is whether substantial evidence supported the determination. *Special Fund v. Francis*, Ky., 708 S.W.2d 641, 643 (1986). Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people. *Smyzer v. B.F. Goodrich Chemical Co.*, Ky., 474 S.W.2d 367 (1971). Although a party may note evidence which would have supported a different conclusion than that which the ALJ reached, such evidence is not an adequate basis for reversal on appeal. *McCloud v. Beth-Elkhorn Corp.*, Ky., 514

-18-

S.W.2d 46 (1974). The crux of the inquiry on appeal is whether the finding which was made is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law. *Special Fund v. Francis*, *supra*, at 643.

And in *Special Fund v. Francis*, 708 S.W.2d at 643, the Supreme Court instructed:

> If the fact-finder finds against the person with the burden of proof, his burden on appeal is infinitely greater. It is of no avail in such a case to show that there was some evidence of substance which would have justified a finding in his favor. He must show that the evidence was such that the finding against him was unreasonable because the finding cannot be labeled "clearly erroneous" if it reasonably could have been made.

In the present case, Parson was successful in meeting his burden of proof. Therefore, we must determine whether the ALJ's decision is supported by substantial evidence.

It has long been held in Kentucky that the ALJ has the authority to assess the credibility of witnesses and the persuasive weight of the evidence, KRS 342.285, and the ALJ, not the Board, is empowered "to determine the quality, character, and substance of evidence." *American Greetings Corp. v. Bunch*, 331 S.W.3d 600, 602 (Ky. 2010) (footnote omitted). The ALJ is also free to reject testimony, *id.*, and "to believe part of the evidence and disbelieve other parts of the evidence[.]" *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977). Accordingly, the Board "shall not substitute its judgment for that of the administrative law judge as to the weight of evidence on questions of fact[.]" KRS

342.285(2); *see also FEI Installation, Inc. v. Williams*, 214 S.W.3d 313, 316 (Ky. 2007). And "if the physicians in a case genuinely express medically sound, but differing, opinions as to the severity of a claimant's injury, the ALJ has the discretion to choose which physician's opinion to believe." *Jones v. Brasch-Barry General Contractors*, 189 S.W.3d 149, 153 (Ky. App. 2006).

For its first argument, Trane asserts that the ALJ erred in relying on Dr. Guberman's assessment that Parson's entire bilateral shoulder impairment was related to his work. KRS 342.730(1)(b) provides for the determination of income benefits, in relevant part, as follows:

> For permanent partial disability, sixty-six and two-thirds percent (66- 2/3 %) of the employee's average weekly wage but not more than eighty-two and one-half percent (82.5%) of the state average weekly wage as determined by KRS 342.740, multiplied by the permanent impairment rating caused by the injury or occupational disease as determined by the "Guides to the Evaluation of Permanent Impairment," times the factor set forth in the table that follows[.]

As Trane states, a claimant must establish that the permanent impairment is related to his work injury before benefits may be awarded. "The burden is upon the claimant to prove the causation of injury was work connected." *Jones v. Newberg*, 890 S.W.2d 284, 285 (Ky. 1994).

Here, Trane argues that Parson failed in his burden to prove that his entire shoulder impairment was related to his work, citing Dr. Lyon's evaluation

that a portion of the impairment was a normal part of the aging process. Dr. Lyon, Trane states, was the only orthopedic specialist to evaluate Parson, unlike Dr. Guberman, who is a cardiologist. In addition, Trane points out that Dr. Guberman appeared to misunderstand how much time Parson spent doing overhead work during his time with Trane. However, we must agree with Parson that Dr. Guberman's evaluation and impairment rating represent substantial evidence supporting the ALJ's decision in this case. It is the ALJ's "sole authority [as the fact-finder] to judge the weight, credibility, substance, and inferences to be drawn from the evidence." *AK Steel Corp. v. Adkins*, 253 S.W.3d 59, 64 (Ky. 2008). As the Board held, there was no challenge to Dr. Guberman's calculation of the impairment rating, and as he is a licensed medical physician, the ALJ was free to rely on his evaluation result as opposed to that of Dr. Lyon. "The [ALJ] had the right to believe part of the evidence and disbelieve other parts of the evidence whether it came from the same witness or the same adversary party's total proof." *Caudill*, 560 S.W.2d at 16. Therefore, based upon Dr. Guberman's assessment of a 7% impairment rating related to his work for Trane, we hold that substantial evidence supports the ALJ's finding in this regard. The ALJ was not required to rely upon Dr. Lyon's opinion that part of Parson's shoulder impairment was not related to his work.

For its second argument, Trane contends that the ALJ abused his discretion in applying the 3x multiplier to Parson's award of income benefits. KRS 342.730(1)(c)1. provides:

> If, due to an injury, an employee does not retain the physical capacity to return to the type of work that the employee performed at the time of injury, the benefit for permanent partial disability shall be multiplied by three (3) times the amount otherwise determined under paragraph (b) of this subsection, but this provision shall not be construed so as to extend the duration of payments[.]

"A worker's testimony is competent evidence of his physical condition and of his ability to perform various activities both before and after being injured." *Ira A. Watson Dep't Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000) (citing *Hush v. Abrams*, 584 S.W.2d 48 (Ky. 1979)).

Trane argues that because Parson had worked full duty without any restrictions or medical treatment until he left the company due to a planned lay-off, he was not entitled to the 3x multiplier. Trane continues to argue that Dr. Guberman did not have an accurate understanding of how often Parson had to perform overhead work as he stated in his evaluation that he did so 75% of the time. Our review of Dr. Guberman's evaluation, like the Board's, establishes that Dr. Guberman was describing overhead work in Parson's last job with Trane in controls:

He states the last day he worked he was operating controls. That involved standing and burning wire. He states that approximately 75 percent of the time he had to use his arms above the level of his shoulders and he had to do repeated lifting and movement with the wiring.

In addition, Trane argues that Parson had not had any medical care for his shoulders, had returned to work for Central Kentucky Hauling for which he was required to pass a CDL physical examination, and had maintained activities outside of his work including yard work, maintenance and upkeep on rental properties, and hunting.

As with the analysis of the previous issue, the ALJ was free to rely upon the opinion of Dr. Guberman that Parson did not retain the physical ability to return to the type of work he performed at Trane and that he was subject to work restrictions. And the ALJ was permitted to rely upon Parson's own testimony as to his ability to work. While another fact-finder may have reached a different conclusion, there is certainly substantial evidence to support the ALJ's finding that Parson did not retain the physical capacity to return to the type of work he performed at Trane, which qualified him for the application of the 3x multiplier in this case.

For the foregoing reasons, the opinion of the Workers' Compensation Board affirming the Administrative Law Judge's opinion, order, and award is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:

W. Clayton Stone II
Lexington, Kentucky

BRIEF FOR APPELLEE TIM
PARSON:

McKinnley Morgan
Dan Scott
London, Kentucky